IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 15, 2020

## STATE OF TENNESSEE v. JEFFERY DEWAYNE STRONG

**Appeal from the Criminal Court for Macon County
No. 56CC1-2016-CR-110  Brody N. Kane, Judge**

_____

### No. M2018-00216-CCA-R3-CD

_____

A Macon County Criminal Court Jury convicted the Appellant, Jeffery Dewayne Strong, of selling a Schedule III, controlled substance, a Class D felony, and the trial court sentenced him as a Range III, persistent offender to twelve years in confinement.  On appeal, the Appellant contends that the evidence is insufficient to support the conviction and that the trial court erred by allowing the State to play an audio recording of the controlled drug buy.  Based upon the record and the parties' briefs, we conclude that the evidence is sufficient to support the conviction and that the Appellant waived the issue regarding the audio recording because he failed to raise it in his motion for a new trial or at the hearing on the motion.  Accordingly, the judgment of the trial court is affirmed.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ALAN E. GLENN, J., joined.  THOMAS T. WOODALL, J., not participating.

Eric L. Phillips (on appeal and at trial) and Adam W. Parrish (at trial), Lebanon, Tennessee, for the appellant, Jeffery Dewayne Strong.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Assistant Attorney General; Tom P. Thompson, Jr., District Attorney General; and Jason Lawson, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background

This case relates to an undercover drug buy conducted by the Fifteenth Judicial District Drug Task Force on January 26, 2015.  In February 2016, the Macon County Grand

Jury indicted the Appellant for selling a Schedule III controlled substance, dihydrocodeinone.

At trial, Jose Ruiz testified that he was a police officer for the Lafayette Police Department from 1998 to January 26, 2017. In January 2015, Ruiz was an agent for the Drug Task Force, and his responsibilities included conducting controlled drug buys. On January 26, 2015, Misty Moore was working as a confidential informant (CI) for the Drug Task Force and contacted Agent Ruiz about making a controlled buy in Macon County. Detective Ruiz and two other officers traveled from Trousdale County to Macon County and met with Moore near a park in Lafayette. The park was across the street from Moore's apartment.

Agent Ruiz testified that he searched Moore by checking her pockets and waistline, issued recording devices to her, and gave her "marked" money to purchase drugs. Moore walked back to her apartment, and Agent Ruiz could hear her in "real time" via the equipment. A black car pulled up to Moore's apartment, and Agent Ruiz wrote down the car's license plate number. Moore got into the black car, and Agent Ruiz began following the vehicle. However, he "back[ed] off" so that the occupants of the car would not notice him. Agent Branden Gooch, who was in a second police vehicle, continued "tailing" the car. The car pulled into a Marathon parking lot on Highway 52, and Agent Gooch observed the drug buy. Agent Ruiz could not see the exchange but remained close enough to hear the transaction. After the drug buy, Agent Ruiz returned to the original location near the park and waited for Moore to arrive. The black car pulled up to Moore's apartment, Moore got out of the car, and the car left. Moore walked to the park and gave Agent Ruiz ten hydrocodone pills. Agent Ruiz searched Moore and obtained the recording devices from her. He said he did not remember if he paid Moore for her participation in the drug buy or if she was working for the Drug Task Force to reduce her own drug charges.

On cross-examination, Agent Ruiz testified that his search of Moore before the drug buy was "a little bit more than a pat down" for weapons and acknowledged that Moore could have had pills concealed in her bra. During the drug buy, Agent Ruiz took notes of what was said in the black car based on what he heard via the audio equipment. His notes did not show that the Appellant said anything. Agent Ruiz explained that he could "only write so fast" and that he was unable to "write down word for word verbatim as they're speaking." Agent Ruiz could not see who was in the black car, so he did not see the Appellant. He said his "understanding of the case" was that the Appellant and the Appellant's girlfriend "met another vehicle [and] got the drugs from another guy." Agent Ruiz never recovered the marked money that he gave Moore for the drug buy.

On redirect examination, Agent Ruiz testified that the Appellant and the Appellant's girlfriend, Kasandra Eagan, were both charged with selling dihydrocodeinone. According

to Agent Ruiz's handwritten notes, he met Moore near the park at 4:34 p.m., Moore "[made] contact" with the Appellant at 4:56 p.m., and the drug buy occurred soon thereafter at 5:06 p.m. Agent Ruiz also wrote in his notes that Moore "purchased [10 hydrocodones] from Kasandra Eagan and Jeffrey Strong for $90 in Macon County." At the conclusion of Agent Ruiz's testimony, the parties stipulated that the license plate number recorded by Agent Ruiz was registered to the Appellant's Honda Civic.

Misty Moore acknowledged that the State subpoenaed her to testify against the Appellant. Sometime prior to January 26, 2015, the Drug Task Force charged Moore with selling hydrocodone. Subsequently, Moore learned she could work as a CI for the Drug Task Force. The Drug Task Force was supposed to pay her $100 for each transaction and "help" her with her own drug case. Moore said she worked as a CI for the Drug Task Force only one time, i.e., the Appellant's case, because she "got scared" and because her "nerves couldn't take it."

Moore testified that on January 26, 2015, she texted Eagan about obtaining hydrocodone. Moore received a text from Eagan's telephone, so Moore sent another text to Eagan's telephone, stating that Moore wanted ten hydrocodone pills. Moore received a second text from Eagan's telephone, stating that the pills would be ninety dollars.

Moore testified that she contacted Agent Ruiz and met him "by the park" across the street from her apartment. Moore did not have a car, so she walked to the park. Agent Ruiz asked if Moore had anything illegal on her person, and Moore emptied her pockets to show him that she did not have anything. Agent Ruiz gave her ninety dollars and a recording device, and Moore walked back to her apartment.

Moore testified that she "seen them pull up," that she went outside, and that she got into the black Honda. The Appellant was driving, Eagan was sitting in the front passenger seat, and Eagan's three-year-old daughter was in a car seat behind Eagan. Moore sat in the back seat behind the Appellant. The State asked why Moore got into the car, and she answered, "To go get the medication and come back home."

Moore testified that the Appellant drove to a Marathon gas station. A red car arrived, and a man got out of the car. The man approached the driver's side window of the Honda, and Moore handed the buy money to Eagan. Eagan handed the money to the Appellant, and the Appellant handed the money to the man at the window. The man then handed pills to the Appellant. The Appellant handed the pills to Eagan, Eagan handed the pills to Moore, and Moore put the pills into a cigarette pack. The Appellant drove Moore back to her apartment. When the Appellant drove away from the apartment, Moore walked across the street and gave the pills to Agent Ruiz. Moore emptied her pockets to show

Agent Ruiz that she did not have any drugs and gave the recording device back to him. She received one hundred dollars and returned to her apartment.

The State played the audio recording of the drug buy for the jury.[1] Moore testified about the recording and identified female voices as belonging to her, Eagan, and Eagan's daughter. She identified a male voice as that of the Appellant. Moore said that on the recording, the Appellant told her that she should have brought gas money and asked her about her pain. Moore told him, "I won't go to the doctor." After the drug transaction, Eagan told Moore that Moore "lucked out" in obtaining the pills because the man in the red Altima did not have many pills earlier. Moore told Eagan that she would text Eagan on Wednesday about buying additional pills, and Eagan responded that she would let Moore know "if they had any." Eagan wrote her new telephone number and the Appellant's telephone number on a piece of paper and gave the paper to Moore. Moore was supposed to put their telephone numbers "in [her] phone."

On cross-examination, Moore testified that she did not have a car or a driver's license and that she walked where she needed to go "if it ain't too far." If she could not walk, then she relied on others for transportation. Defense counsel asked, "Back in 2015 was it uncommon practice for you to ask [the Appellant] or [Eagan] for [a] ride to the grocery store?" Moore answered, "No, sir. If I needed to go somewhere, they took me." On January 26, 2015, Moore sent a text to Eagan's telephone, and Eagan's telephone responded. However, Moore did not know with whom she was communicating. Moore received a text from Eagan's telephone that said "[t]hey" were on their way to pick up Moore.

Moore testified that she never had a conversation with the Appellant about buying drugs, and she acknowledged that the pills "didn't come from" Eagan or the Appellant. Defense counsel asked who the pills came from, and Moore answered, "The guy that we went and met. Got them from him." When Moore met with Agent Ruiz after the drug buy, Agent Ruiz asked her from whom she bought the drugs. Moore told him, "Kassie Eagan." Agent Ruiz asked who was with Eagan, and Moore told him, "Jeff Stout." Moore said she thought the Appellant's last name was "Stout," and she identified the Appellant at trial as Jeff Stout.

Glenn Jay Glenn, a special agent forensic scientist with the Tennessee Bureau of Investigation's Crime Laboratory, testified as an expert in the forensic identification of controlled substances. He testified that he analyzed the ten pills recovered by Agent Ruiz. One of the pills was marked "M367," and the other nine pills were marked "Watson 853." All of the pills were dihydrocodeinone, a Schedule III controlled substance also known as

---

[1] We were unable to play the recording due to technical issues.

hydrocodone. On cross-examination, Agent Glenn testified that all of the pills were ten-milligram tablets.

Branden Gooch testified that on January 26, 2015, he was an agent with the Fifteenth Judicial District Drug Task Force and participated in the drug buy involving the Appellant. Agent Ruiz and another agent were in a minivan, and Agent Gooch was in a truck. While Agent Ruiz "met up" with the CI, Agent Gooch "pulled off the side by [him]self." A black Honda picked up the CI, and the two police vehicles began "tailing" the Honda. Agent Ruiz was in the lead police vehicle, followed by Agent Gooch. At some point, Agent Gooch "broke off" from Agent Ruiz and pulled into the Marathon gas station on Highway 52. The black Honda was parked to the left of Agent Gooch. A maroon Altima pulled into the parking lot, and a slender white male got out of the Altima and went to the driver's side of the Honda. The man spoke with someone on the driver's side of the Honda, and Agent Gooch "snapped a few photos." After the Altima and the Honda left the Marathon parking lot, Agent Gooch met with the other agents and returned to Trousdale County.

On cross-examination, Agent Gooch testified that he could not see into the Honda and, therefore, was unable to see the drug transaction. However, he was able to monitor the transaction via the radio in his truck. He said that the man who arrived in the Altima was a "drug dealer" and that the man "pass[ed]" the drugs to the Appellant, who was driving the Honda. On redirect examination, Agent Gooch acknowledged that he also would characterize the Appellant and Eagan as "drug dealers."

At the conclusion of Agent Gooch's testimony, the jury convicted the Appellant of selling dihydrocodeinone, a Class D felony. After a sentencing hearing, the trial court sentenced him as a Range III, persistent offender to twelve years in confinement.

## II. Analysis

The Appellant claims that the evidence is insufficient to support the conviction and that the trial court erred by admitting the audio recording of the drug buy into evidence. The State argues that we should dismiss the appeal because the Appellant's motion for new trial and notice of appeal were untimely. The State also argues that in any event, the evidence is sufficient to support the conviction and that the trial court properly admitted the audio recording. We conclude that the evidence is sufficient to support the conviction and that the Appellant has waived his issue regarding the recording.

Regarding the State's waiver argument, a motion for new trial must be made in writing or reduced to writing within thirty days of the "date the order of sentence is entered." Tenn. R. Crim. P. 33(b). This provision is mandatory, and the time for the filing cannot be extended. Tenn. R. Crim. P. 45(b); State v. Martin, 940 S.W.2d 567, 569 (Tenn.

1997). "If a motion for new trial is not timely filed, all [the appellant's] issues are deemed waived except for sufficiency of evidence and sentencing." State v. Bough, 152 S.W.3d 453, 460 (Tenn. 2004) (citing Tenn. R. App. P. 3(e)). Moreover, the untimely filing of a motion for new trial does not toll the time for filing a notice of appeal. Therefore, an untimely motion for new trial often will also result in an untimely notice of appeal. State v. Davis, 748 S.W.2d 206, 207 (Tenn. Crim. App. 1987).

The trial court sentenced the Appellant on December 14, 2017. The "Date of Entry" printed on the judgment of conviction is "12/14/17," but the judgment of conviction bears a file-stamp date of December 27, 2017. The Appellant filed his motion for new trial on January 16, 2018.[2] Therefore, his motion for new trial was not untimely. See State v. Stephens, 264 S.W.3d 719, 729 (Tenn. Crim. App. 2007) (stating that "the 'file-stamp' date provides evidence of when the order of sentence was entered by the clerk" and, therefore, that "the effective date for entry of a judgment or order of sentence is the date of its filing with the court clerk after being signed by the judge"). The trial court denied the motion for new trial on June 7, 2019, and the Appellant filed his notice of appeal on June 14, 2019. Accordingly, his notice of appeal also was not untimely. However, the Appellant did not raise the issue of the audio recording in his motion for new trial or at the hearing on the motion. Therefore, that issue is waived. See Tenn. R. App. P. 3(e).

As to his remaining claim, the Appellant asserts that the evidence is insufficient to support the conviction because the drug buy occurred between the CI and the unidentified man in the maroon Altima; because nothing indicates that the Appellant received any benefit from the sale; and because the evidence shows that the Appellant asked the CI for gas money and was simply providing her with transportation. The Appellant also asserts that he could not be held criminally responsible for the acts of Eagan or the unidentified man and that, at most, he is guilty of facilitating the sale of dihydrocodeinone. The State argues that the Appellant is guilty under a theory of criminal responsibility because he "'associated himself with Ms. Eagan by allowing the drug sale to take place in the car he drove, and allowing the money and the pills to pass through his hands."

When an appellant challenges the sufficiency of the convicting evidence, the general standard of review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential

---

[2] The Appellant attached a copy of his motion for new trial to his appellate brief, but the file-stamp date on the motion was unreadable. In any event, "documents attached to an appellate brief but not included in the record on appeal cannot be considered by this court as part of the record on appeal." Grover L. Dunigan v. State, No. E2005-01574-CCA-R3-PC, 2006 WL 433699, at *3 (Tenn. Crim. App. at Knoxville, Feb. 23, 2006); see also State v. Matthews, 805 S.W.2d 776, 783-84 (Tenn. Crim. App. 1990). On November 2, 2020, this court ordered that the trial court clerk supplement the record with the Appellant's motion for new trial and the trial court's order denying the motion.

elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

It is an offense for a defendant knowingly to sell a controlled substance. Tenn. Code Ann. § 39-17-417(a)(3). Dihydrocodeinone is a Schedule III controlled substance. See Tenn. Code Ann. § 39-17-408(b)(1)(F). "Sale" has been defined by case law as "a bargained for, offer and acceptance and an actual or constructive transfer or delivery of the substance." State v. Holston, 94 S.W.3d 507, 510 (Tenn. Crim. App. 2002). "One who accepts payment in exchange for property is involved in a sale." Id. at 511 (citations omitted). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b).

During closing arguments, the State asserted that the Appellant was guilty of selling dihydrocodeinone either directly or under a theory of criminal responsibility, and the trial court instructed the jury on criminal responsibility. "A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). Criminal responsibility for the actions of another arises when the defendant, "[a]cting with intent to promote or assist the commission of the offense, or to

- 7 -

benefit in the proceeds or results of the offense, . . . the person solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2).

Taken in the light most favorable to the State, the evidence shows that Eagan offered to sell Moore hydrocodone pills for ninety dollars; that Moore accepted Eagan's offer; and that Eagan arranged for the supplier to meet them at the Marathon. The Appellant drove Eagan to Moore's apartment, picked up Moore, and drove Moore and Eagan to the gas station. Shortly thereafter, a maroon Altima arrived. The unidentified man got out of the Altima and went directly to the driver's window of the Appellant's Honda. Moore handed the ninety dollars to Eagan, who handed the money to the Appellant, who handed the money to the man. The man then handed the pills to the Appellant, who handed the pills to Eagan, who handed the pills to Moore. After the transaction, the Appellant drove Moore back to her apartment.

Although nothing indicates that the Appellant or Eagan profited from the sale, profit is not an element of selling a controlled substance. See State v. William (Slim) Alexander, No. 01C01-9302-CR-00063, 1994 WL 95853, at *2 (Tenn. Crim. App. at Nashville, Mar. 24, 1994). Moreover, while "mere presence at a location where drugs are sold or mere association with those selling drugs is not sufficient to establish criminal liability," each case is fact specific. State v. Bigsby, 40 S.W.3d 87, 91 (Tenn. Crim. App. 2000). In State v. Thomas E. Davenport, No. M2000-00317-CCA-R3-CD, 2000 WL 1717541 at *1 (Tenn. Crim. App. at Nashville, Nov. 17, 2000), the defendant and his codefendant, Simmons, were charged with selling cocaine to a CI. At trial, the proof established that the CI went to the defendant's home, that the CI spoke with Simmons, and that the CI gave Simmons the money for the drug buy. Thomas E. Davenport, No. M2000-00317-CCA-R3-CD, 2000 WL 1717541 at *1. Simmons left the home and returned twenty minutes later. Id. He went to the kitchen table, broke off five cocaine rocks, and gave the rocks to the CI. Id. The defendant was sitting on the couch in another room but could see the kitchen table. Id. As the CI was leaving, she "gratuitously" gave one of the rocks to the defendant "'because it was his house.'" Id. In finding that the evidence was insufficient to show that the defendant actually sold the cocaine to the informant or that the defendant was criminally responsible for the actions of Simmons, this court noted that nothing indicated that the defendant intended to benefit from the transaction and that it was Simmons who made the "deal," accepted payment, acquired the cocaine, brought the cocaine onto the premises, and gave the cocaine directly to the CI. Id. at *5-6.

Unlike the facts in Thomas E. Davenport, the facts in this case show more than mere presence or association with those selling drugs. The Appellant used his Honda to transport Eagan and Moore to the Marathon. We note that during the drive, neither Eagan nor Moore talked with the Appellant about buying drugs or directed him to the Marathon. Therefore, the Appellant obviously knew before he picked up Moore that a drug transaction was going

to take place there. When the man supplying the pills arrived at the Marathon, Moore gave the money to Eagan and the Appellant, and they gave the money to the supplier. The supplier gave the pills to the Appellant and Eagan, and they gave the pills to Moore. After the exchange, Moore and Eagan discussed buying additional pills, and Eagan wrote her telephone number and the Appellant's telephone number on a piece of paper for Moore. From this evidence, a rational jury could have concluded that Eagan and the Appellant provided Moore with access to the drug supplier and that the Appellant was acting in concert with Eagan to sell drugs to Moore. Accordingly, the evidence is sufficient to support the Appellant's conviction.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA MCGEE OGLE, JUDGE